## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RESERVE REAL ESTATE GROUP, INC. d/b/a MEDTEK SOLUTION,** | : | **CIVIL ACTION NO. 1:25-CV-641** |
| | : | |
| | : | **(Judge Neary)** |
| **Plaintiff & Counterclaim Defendant** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PRECISION WOUND CARE LLC, and GARY RYAN, as managing member and individually,** | : | |
| | : | |
| | : | |
| | : | |
| **Defendants, Counterclaim Plaintiffs & Third-Party Plaintiffs** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GABE DIETRICH and SOPHIA MATSANGAKIS,** | : | |
| | : | |
| **Third Party Defendants** | : | |

## <u>MEMORANDUM</u>

This case arises from a hotly disputed contract termination between companies working in the wound care industry. Plaintiff and counterclaim defendant Reserve Real Estate Group d/b/a MedTek Solution ("MedTek") and third party defendants Gabe Dietrich and Sophia Matsangakis (collectively, the "MedTek Parties") move: (1) to dismiss the first amended counterclaims and third party complaint (the "FAC") filed by defendants, counterclaim plaintiffs, and third-party

plaintiffs Precision Wound Care LLC ("Precision") and Gary Ryan (collectively, the "Precision Parties"), (2) to strike certain paragraphs of the FAC as well as the FAC's request for punitive damages and references to allegedly "malicious, willful, wanton, and reckless" conduct, and (3) to stay discovery pending resolution of these motions. (Docs. 53, 63, 66). Additionally, in their reply brief, the MedTek parties challenge this courts subject matter jurisdiction on the basis of Federal Rule of Civil Procedure 17. (Doc. 83). The court, concluding it has subject matter jurisdiction over the counterclaims, will grant in part and deny in part the MedTek Parties' motion to dismiss, will deny the motion to strike, and will deny the motion to stay discovery as moot.

## I.    Factual Background & Procedural History

### a.    Complaint and FAC

As alleged in the complaint,[1] MedTek is the fictious name of a Pennsylvania corporation that assists medical equipment manufacturers with locating medical providers who need the manufacturers' products and with selling those products to the providers. (Doc. 2-1 ¶¶ 12-14). The manufacturer and provider contract directly with each other, the manufacturers ship the products directly to the providers, and the providers pay the manufacturers directly, with MedTek providing contract management services and receiving a referral commission from the manufacturers. (Id. ¶¶ 13-15). Typically, the providers pay for the products through reimbursements

---

[1] The court includes the allegations from MedTek's complaint only for the purpose of providing context to the dispute. The allegations are not considered for purposes of the pending motion to dismiss.

from insurance companies, Medicare, or Medicaid, though they are obligated to pay for the products regardless of the reimbursement status. (Id. ¶¶ 18-19). As is also typical in the industry, MedTek relies on sales representatives who are independent contractors to solicit providers and then sell the manufacturers products to the providers on behalf of MedTek. (Id. ¶¶ 20-21). MedTek regularly communicates with the sales representatives to ensure timely payment is made to the manufacturers, as MedTek receives a commission from the manufacturer, and in turn pays a commission to the sales representatives. (Id. ¶¶ 23-25).

Gabe Dietrich is the president of MedTek and Sophia Matsangakis is its managing partner. (Id. ¶¶ 10-11). On August 9, 2024, MedTek entered into an independent contractor agreement with the Andelle Group LLC, a Wyoming company that also operates in the wound care industry and is owned and managed by Gary Ryan. (Id. ¶¶ 26-27). On October 3, 2024, MedTek entered into an independent contractor agreement with Precision, a Delaware limited liability company also owned and managed by Ryan, and signed by Ryan, which superseded the agreement between MedTek and Andelle. (Id. ¶¶ 28-29). Under the terms of the agreement, Precision would sell and market products from manufacturers with whom MedTek had a relationship in exchange for a commission. (Id. ¶ 31). The October 3 agreement included, among other provisions, that the parties agreed to comply with all applicable laws and that "no part of the Fees, pricing, or consideration paid hereunder is intended for the recommending or arranging for

impermissible referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business." (Id. ¶¶ 36-37).

On February 7, 2025, Dietrich sent an email to Ryan regarding provider accounts that had past due balances owed to manufacturers and inquired as to when the providers would pay. (Id. ¶¶ 42-43). Dietrich followed up with Ryan by email on February 12, 2025, inquiring about specific accounts with past due balances. (Id. ¶ 44). The next day, Ryan allegedly responded that each provider intended to pay and that he "would also be willing to make some good faith payments/escrow on [the providers'] behalf if it is a manageable amount as I have confidence in the providers as well." (Id. ¶ 45). Dietrich responded on February 19, 2025, that Ryan's suggested payments on the providers' behalf "would be a compliance violation and completely unacceptable. MedTek would need to terminate our contract immediately if there were any such activities taking place or we were made aware of such activities." (Id. ¶ 46). Ryan indicated that it was "an idea, not fully thought out at all or discussed with anyone else." (Id. ¶ 47). However, MedTek alleges it uncovered that Ryan had indeed made this offer directly to one provider, and on March 17, 2025, it terminated its agreement with Precision. (Id. ¶¶ 48-49). Additionally, the termination letter sent from MedTek to Precision stated that "[d]ue to the nature of this termination and in accordance with the terms of your Agreement, no further commissions or payments will be due or owing to your company." (Id. ¶ 58).

On March 18, 2025, Ryan emailed all Precision sales representatives informing them of the contract termination due to an alleged violation of law, that

MedTek was withholding commissions owed to them, and that MedTek and Sophia "have essentially stolen from us." (Id. ¶¶ 65-68). Since then, Ryan has allegedly contacted Precision sales representatives and told them not to work for MedTek and has told providers they do not have to pay the manufacturers. (Id. ¶¶ 71-77).

MedTek filed a writ of summons in the Court of Common Pleas of Cumberland County on March 24, 2025. (Doc. 2-1 at ECF 4). On April 9, 2025, MedTek filed a complaint in the same court. (Doc. 2-1 at ECF 8-45). Precision removed the case to this court on April 10, 2025. (Doc. 2).  MedTek alleges nine state-law claims against the Precision Parties: (1) breach of contract, (2) breach of covenant of good faith and fair dealing, (3) unjust enrichment (in the alternative), (4) tortious interference with contract, (5) tortious interference with prospective contractual relations, (6) negligence (in the alternative), (7) defamation/libel, (8) misappropriation of trade secrets under Pennsylvania Uniform Trade Secrets Act, and (9) permanent injunctive relief.[2] (Doc. 2-1 ¶¶ 83-184).

The Precision Parties then filed an answer, counterclaims, and a third-party complaint against MedTek, Dietrich, and Matsangakis. (Doc. 14). On May 22, 2025, the Precision Parties filed the FAC. (Doc. 53). As relevant to the pending motions,

---

[2] MedTek filed a motion (Doc. 7) for preliminary injunction on April 10, 2025, but later requested (Doc. 37) to withdraw that motion, which the court granted on May 8, 2025. (Doc. 41).

the allegations in the FAC present a starkly different picture underlying the formation of the October 3 contract, its termination, and subsequent events.

According to the Precision Parties, Reserve Real Estate was incorporated in Pennsylvania on August 3, 2023, and registered MedTek Solution as a fictious name on July 26, 2024. (Doc. 53 ¶¶ 19, 23). This is despite the complaint stating that Dietrich and Matsangakis have been doing business as MedTek for three to four years and that Matsangakis has held herself out to the public as the managing partner of MedTek since mid to late 2019. (Id. ¶¶ 24-26). Dietrich and Matsangakis used MedTek, a fraudulent company, to conduct business in the wound care industry, including to contract with Precision. (Id. ¶ 27). They did so to avoid liability and risk while advancing their personal interests, and comingled personal funds with the nonexistent MedTek entity. (Id. ¶ 30).

Ryan has been involved in the wound care industry since 2023, and is the sole owner of two companies, Andelle Group LLC, and Precision. (Id. ¶¶ 34-35). Ryan found success in the industry and Precision hired numerous sales representatives who benefited from Precision's provider contacts. (Id. ¶¶ 36-37). In May 2024, Dietrich and Matsangakis approached Ryan about contracting to sell products to providers. (Id. ¶ 39). Dietrich and Matsangakis represented to Ryan that they owned a company with significant experience in the wound care industry and had numerous relationships with manufacturers offering favorable commissions. (Id. ¶

40). They did not inform Ryan that MedTek was a fake company with little sales, and that MedTek did not employ anyone who sold products. (Id.)

Following negotiations, in June 2024, Ryan received a contract from MedTek that he executed on behalf of Andelle, and which Matsangakis executed on behalf of the nonexistent MedTek. (Id. ¶ 42). Ryan was immediately successful, and in August 2024, Ryan and Matsangakis executed a second contract between MedTek and Andelle, which expanded the number of products to sell providers and superseded the previous contract. (Id. ¶¶ 43-45). In October 2024, MedTek entered into an independent contractor agreement with Precision, which superseded the previous contract between MedTek and Andelle, and with any obligations now being owed to Precision. (Id. ¶¶ 46-47). The October 2024 contract provided that Precision would be paid a commission based on a commission schedule and on the quantity of products sold each month, with payment to Precision occurring within ten days of MedTek's receipt of payment from the manufacturers. (Id. ¶¶ 52-54). The contract contains termination provisions, providing that either party may terminate the contract with or without cause by giving the other thirty days prior written notice. (Id. ¶ 55). "Cause" is not defined, though for terminations without cause, the contract states that MedTek shall pay Precision "any amounts owed under Section 3(a) hereof as of the date of termination or expiration." (Id. ¶¶ 56-57).

Precision claims it was MedTek's top performing independent contractor, selling tens of millions of products on MedTek's behalf. (Id. ¶¶ 58, 61). Precision often waited months to receive its commission following a sale, as providers typically waited to receive a reimbursement before paying. (Id. ¶ 59). MedTek

looked for ways to get out of paying commissions to increase its own profit margins. (Id. ¶ 62). Precision provides examples of its sales representatives who sold millions of dollars in product and for whom MedTek withheld or still owes commissions to Precision. (Id. ¶¶ 63-68).

On March 17, 2025, Dietrich emailed Ryan stating that MedTek was terminating the October 2024 agreement because Ryan "engaged in behavior that is in violation of federal regulatory provisions" and which violated the agreement. (Id. ¶¶ 69-70). The alleged violation did not occur, as Ryan did not make a payment to a provider or even offer to pay a provider, and this violation was a pretext to terminate the agreement and get out of paying Precision the millions of dollars in commissions it was owed. (Id. ¶¶ 71-76). Around the same time, the MedTek parties began attempting to steal Precision's sales representatives by communicating directly with them and stating that the Precision Parties could not be trusted, that the contract was terminated for compliance violations, and that MedTek would pay commissions directly. (Id. ¶¶ 77-105). The Precision Parties believe that the MedTek Parties have also communicated similarly disparaging comments to providers and manufacturers. (Id. ¶ 106).

The Precision Parties raise seven counterclaims: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) violations of the Pennsylvania Commissioned Sales Representative Act ("PCSRA"); (4) fraud; (5)

tortious interference with existing contractual relations; (6) defamation; and (7)

unjust enrichment (in the alternative). (Id. at ECF 52-64, ¶¶ 98-168).

After the MedTek Parties filed motions to dismiss, strike, and stay discovery,

(Docs. 43, 46), the Precision Parties filed the FAC, which raised the same seven

claims contained in their original pleading. (Doc. 53). The MedTek Parties renewed

their motions. (Docs. 63, 65)

### b.  **The MedTek Parties' Emergency Letter**

During the briefing of their motions, the MedTek Parties filed an emergency

letter under seal on the docket. (Doc. 70). In the letter, the MedTek Parties sought

an emergency stay of all proceedings because they discovered that Gary Ryan is a

pseudonym, and that Ryan's real name is Karen Kazaryan. (Id.) Kazaryan was

previously convicted in federal court in California of offenses unrelated to this

matter, has been released from incarceration, and was not under court supervision

at any time relevant to this suit. See Case No. 2:13-CR-56-GHK, Central District of

California. The Precision Parties responded under seal and provided the court with

a copy of a name change decree from the Los Angeles County Superior Court dated

May 29, 2025, approving a change from Karen Kazaryan to Gary K. Ryan and of a

social security card bearing the name "Gary K. Ryan" issued on May 30, 2025. (Doc.

74). The MedTek Parties argue that, because Gary Ryan was not Ryan's name at the

time of the filing of the counterclaim, he does not have standing to bring the counterclaim and that this court lacks jurisdiction over it. (Doc. 70).

Briefing has completed, (Docs. 64, 66, 77, 79, 83, 84), and the matters are ripe for the court's disposition.

## II.  **Legal Standard**

### a.  **Subject Matter Jurisdiction**

Subject matter jurisdiction is a federal court's authority to hear a case. Generally, subject-matter jurisdiction arises through the assertion of a federal question or through the diversity of the parties. If a case, as presented by the plaintiff, does not meet the requirements of subject-matter jurisdiction or if it is otherwise barred by law, then the court must dismiss the plaintiff's action. Importantly, the court has "an independent obligation to determine whether subject-matter jurisdiction exists even in the absence of a challenge from the defendant." Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). Federal courts cannot exercise jurisdiction where Congress has not given it, even if all parties assume subject matter jurisdiction exists. Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd., 836 F.3d 261, 267 (3d Cir. 2016).

### b.  **Motion To Dismiss**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the

plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374.7 (3d Cir. 2002)). In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. Santiago v. Warminster Township, 629 F.3d 121, 130 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556). A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. If the court concludes that a complaint should be dismissed, it "must permit a curative amendment, unless an amendment would be inequitable or futile." Phillips, 515 F.3d at 236.

### c. **Motion To Strike**

Under Federal Rule of Civil Procedure 12(f), the court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).  District courts have "considerable discretion" in resolving a Rule 12(f) motion. Krisa v. Equitable Life Assurance Soc'y, 109 F. Supp. 2d 316, 319 (M.D. Pa. 2000) (quoting N. Penn. Transfer, Inc. v. Victaulic Co. of Am., 859 F. Supp. 154, 158 (E.D. Pa. 1994)). In general, such a motion will be denied unless the allegations are severely prejudicial to one of the parties and unrelated to the plaintiff's claims. Id.; see also 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1382 (3d ed. 2016). A party is prejudiced when the challenged pleading "confuses the issues" or places an undue burden on the responding party. Karpov v. Karpov, 307 F.R.D. 345, 348 (D. Del. 2015).

### d. **Motion To Stay Discovery**

Whether to stay discovery is within the court's discretion. Commonwealth v. Navient Corp., 348 F. Supp. 3d 394, 401 (M.D. Pa. 2018). A stay of discovery may be appropriate "while evaluating a motion to dismiss where, if the motion is granted, discovery would be futile," Mann v. Brenner, 375 F. App'x 232, 239 (3d. Cir. 2010) (collecting cases), and that "a stay is proper where the likelihood that such motion may result in a narrowing or an outright elimination of discovery outweighs the

likely harm to be produced by the delay." <u>19th Street Baptist Church v. St. Peters Episcopal Church</u>, 190 F.R.D. 345, 349 (E.D. Pa. 2000). Nevertheless, "[t]here is nothing in the Federal Rules of Civil Procedure that *mandates* that discovery should not proceed before a motion to dismiss is decided." <u>Navient Corp.</u>, 348 F. Supp. 3d at 401(emphasis added).

### III.  <u>Discussion</u>

The MedTek Parties seek to dismiss the FAC on numerous grounds, including subject matter jurisdiction, to strike numerous paragraphs of the FAC as well as the FAC's request for punitive damages and references to allegedly "malicious, willful, wanton, and reckless" conduct, and to stay discovery pending the resolution of these motions. (Docs. 63, 65).

#### a.  <u>Rule 17 and Subject Matter Jurisdiction</u>

As an initial matter, the MedTek Parties challenge this court's subject matter jurisdiction in their reply brief, arguing that the court lacks subject matter jurisdiction over Ryan's counterclaim because Federal Rule of Civil Procedure 17 requires that "[a]n action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a)(1), and Gary Ryan was named Karen Kazaryan at the time the counterclaim was filed. (Doc. 83). Their logic follows that Ryan lacks standing to bring the counterclaim, and this court lacks subject matter jurisdiction.

A review of Rule 17's other provisions that go uncited in the MedTek Parties' reply brief reveals the evident nonjurisdictional nature of Rule 17. Section (c) of Rule 17 states that a "court may not dismiss an action for failure to prosecute in the

name of the real party in interest until, after an objection, a reasonable time has

been allowed for the real party in interest to ratify, join, or be substituted into the

action. After ratification, joinder, or substitution, the action proceeds as if it had

been originally commenced by the real party in interest." FED. R. CIV. P. 17(c). If

Rule 17 implicated the court's subject matter jurisdiction, dismissal could neither

require a prior objection nor the opportunity to fix the defect. Instead, numerous

courts to have considered the issue have found that Rule 17 concerns the merits

rather than jurisdiction. See Int'l Transp. Mgmt. Corp. v. Brooks Fitch Apparel

Grp., LLC, 2022 WL 102252 * 10 (D. N.J. Jan. 10, 2022) (collecting cases).

Here, Karen Kazaryan was the real party in interest[3] at the time the

counterclaim was filed in the name of pseudonym Gary Ryan. The MedTek Parties

objected, and pursuant to Rule 17(c), Ryan provided information that his name was

legally changed from Karen Kazaryan to Gary Ryan, thereby ratifying that Ryan is

the real party in interest bringing the counterclaim. The court thus rejects the

challenge to its subject matter jurisdiction.

**b. Motion To Dismiss**

**i. Veil Piercing**

The FAC seeks to pierce the corporate veil to allege claims against Reserve

Real Estate, Dietrich, and Matsangakis. (Doc. 53 at 21-37). The MedTek Parties

argue that such veil-piercing is improper here where the Precision Parties have

---

[3] Even if the court agreed that Ryan could not bring the counterclaim under the name Gary Ryan, Precision is also a counterclaim and third-party plaintiff, so the counterclaim would proceed with Precision as the sole party.

failed to allege that MedTek failed to follow corporate formalities, where Reserve Real Estate operates under the fictious name "MedTek Solution," and where the Precision Agreement binds MedTek and Precision, not Dietrich and Matsangakis individually. (Doc. 64 at 8-22). The Precision Parties respond that it only seeks to pierce the corporate veil with respect to its breach of contract and breach of the covenant of good faith and fair dealing claims and that the MedTek Parties have used the corporate form purposefully and with the intent to commit fraud against the Precision Parties. (Doc. 79 at 12-20).

Piercing the corporate veil "allow[s] a court to disregard the corporate form and assess one corporation's liability against another." Commonwealth v. Golden Gate Nat'l Senior Care LLC, 194 A.3d 1010, 1034 (Pa. 2018). Pennsylvania law affords a strong presumption against piercing the corporate veil. Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995). Certain "specific, unusual circumstances [may] call for an exception." Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir. 1967). These circumstances include where doing so would "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime," id. at 272, or where "one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests," Ashley v. Ashley, 393 A.2d 637, 641 (Pa. 1978).

Rather than existing as an independent cause of action, a request to pierce the corporate veil "is a means of imposing liability established in an underlying cause of action, such as tort or breach of contract, against another." Golden Gate, 194 A.3d at 1035. Under an alter ego theory, courts in our circuit examine the

following factors to determine whether veil-piercing is appropriate: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." Pearson v. Component Tech. Corp., 247 F.3d 471, 484–85 (3d Cir. 2001). Mere "averments reciting elements of the veil-piercing test, without any supporting facts, constitute legal conclusions. Even under a notice pleading standard, as interpreted in Twombly, such averments cannot support a veil-piercing claim." Cent. Transp., LLC v. Atlas Towing, Inc., 884 F.Supp.2d 207, 217 (E.D. Pa. 2012) (quoting Shenango Inc. v. Am. Coal Sales Co., No. 06–149, 2007 WL 2310869, at *4 (W.D. Pa. Aug. 9, 2007).

The Precision Parties fail to meet their "notoriously difficult" burden of alleging that MedTek operates as "little more than a legal fiction" concocted by Reserve Real Estate, Dietrich, and Matsangakis. Pearson, 247 F.3d at 485. True, the FAC does include allegations of some of the factors considered in the alter-ego analysis—for example, MedTek's alleged undercapitalization and comingling of funds (Doc. 53 ¶¶ 30, 113)—but the Precision Parties have not "pled the quantum of facts necessary to give rise to the reasonable inference that the alter ego test could be satisfied. 18 KT.TV, LLC v. Entest Biomedical, Inc., No. 3:11-CV-244, 2011 WL 5374515, at *9 (M.D. Pa. Nov. 7, 2011). For example, while the Precision Parties argue that MedTek is undercapitalized or commingles funds, they do not allege "facts that would provide a reasonable basis" to support these allegations. J.B. Hunt

<u>Transp., Inc. v. Liverpool Trucking Co.</u>, No. 1:11-CV-1751, 2013 WL 3208586, at *3

(M.D. Pa. June 24, 2013). Put simply, the Precision Parties' "averments cannot

support a veil-piercing claim." <u>Cent. Transp., LLC</u>, 884 F.Supp.2d at 217. Therefore,

to the extent that the Precision Parties seek to pierce the corporate veil with respect

to their breach of contract and breach of the covenant of good faith and fair dealing

claims, the court holds that they are unable to do so.[4]

### ii.  **Breach Of Contract**

The Precision Parties claim that "MedTek materially breached its

contractual obligations to Precision under the Precision Agreement by: (a) failing to

pay commissions and compensation owed to Precision prior to terminating the

Precision Agreement; (b) failing to pay commissions and compensation owed to

Precision at the time it terminated the Precision Agreement; (c) wrongfully

terminating the Precision Agreement and falsely claiming it was a 'for cause'

termination; and (d) making misrepresentations under the Agreement." (Doc. 53 ¶

118). The MedTek Parties seek to dismiss the breach of contract claim against

MedTek, arguing that the Precision Parties fail to allege a duty contained in the

Precision Agreement they have breached. (Doc. 64 at 24-27).

A breach of contract claim under Pennsylvania law requires "(1) the

existence of a contract, including its essential terms; (2) a breach of a duty imposed

by the contract; and (3) resultant damages." <u>City of Allentown v. Lehigh Cty. Auth.</u>,

---

[4] The remaining counterclaims concern statutory, tort, or equitable claims, which are not implicated by veil piercing, and are therefore permitted to continue against Dietrich and Matsangakis.

222 A.3d 1152, 1157 (Pa. Super. Ct. 2019) (quoting <u>Reformed Church of Ascension v.</u> <u>Theodore Hooven & Sons, Inc.</u>, 764 A.2d 1106, 1109 (Pa. Super. Ct. 2000)). The party alleging contractual breach may recover, "unless the contract provided otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty." <u>Ferrer v. Trs. of Univ. of</u> <u>Pennsylvania</u>, 825 A.2d 591, 610 (Pa. 2002) (quoting <u>Taylor v. Kaufhold</u>, 84 A.2d 347, 351 (Pa. 1951)).

The Precision Parties have plausibly alleged a breach of the Precision Agreement. First, there is no dispute that a contract exists between the parties. Second, the Precision Parties allege that MedTek breached several of its duties contained in the Precision Agreement, including, among other things, "failing to pay commissions and compensation owed to Precision prior to terminating the Precision Agreement." (Doc. 53 ¶ 118). Third, the Precision Parties also plausibly allege damages resulting from MedTek's alleged breach—for example, the "commissions and compensation" aforementioned. (<u>Id.</u>). Therefore, MedTek's motion to dismiss this claim will be denied.

### iii.  <u>Breach Of The Covenant Of Good Faith And Fair Dealing</u>

The FAC alleges a breach of the covenant of good faith and fair dealing. (Doc. 53 ¶¶ 121-147). But Pennsylvania law "does not allow an action for breach of the covenant of good faith and fair dealing separate from a breach of contract claim." <u>Landan v. Wal-Mart Real Est. Bus. Tr.</u>, 775 F. App'x 39, 42 (3d Cir. 2019); <u>Burton v.</u>

Teleflex Inc., 707 F.3d 417, 432 (3d Cir. 2013) ("under Pennsylvania law, a 'claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim.'") (quoting LSI Title Agency, Inc. v. Evaluation Servs., Inc., 951 A.2d 384, 391-92 (Pa. Super. Ct. 2008)). Therefore, because the Precision Parties also bring a breach of contract claim, their breach of the covenant of good faith and fair dealing claim will be dismissed insofar as it is pleaded as a separate claim. As this case proceeds, the Precision Parties' arguments on the dismissed claim may "be addressed in connection with [their] surviving breach of contract claim." Davis v. Wells Fargo, 824 F.3d 333, 352 (3d Cir. 2016).

### iv.  **PCSRA**

The FAC alleges that MedTek "violated the PCSRA by failing to timely pay commissions to Precision." (Doc. 53 ¶ 157). The MedTek Parties argue that the FAC does not plausibly allege that the MedTek Parties are "principals" or that Precision is a "sales representative" as defined by the PCSRA and that the Precision Agreement clearly provides that the Precision Parties are not entitled to the commissions. (Doc. 64 at 29-30).

The PCSRA mandates that a "principal shall pay a sales representative all commissions due at the time of termination within 14 days after termination" and "all commissions that become due after termination within 14 days of the date such commissions become due." 43 P.S. §§ 1473–74. Commission is defined as "[c]ompensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the dollar of orders or sales." 43 P.S. § 1471. A principal "(1) [e]ngages in the business of manufacturing, producing,

importing or distributing a product for sale to customers who purchase such products for resale," "(2) [u]tilizes sales representatives to solicit orders for such product," and "(3) [c]ompensates sales representatives, in whole or in part, by commission." Id. A sales representative "contracts with a principal to solicit wholesale orders from retailers rather than consumers and who is compensated, in whole or in part, by commission." Id. However, an individual "who places orders or purchases for his own account for resale or one who is an employee of a principal" does not qualify as a sales representative. Id. And termination under the PCSRA is defined as "[t]he end of services performed by the sales representative for the principal," which "includes any action that concludes the relationship of the parties." Id.

The Precision Parties have plausibly stated a PCSRA claim. The FAC alleges both that the MedTek Parties are principals who "engage in the business of distributing skin substitute products for sale to providers who purchase such products for resale; they utilize Precision, a sales representative, to solicit orders for such products; and they compensate Precision by commission," and that Precision is a sales representative who "contracts with the MedTek Parties to solicit wholesale orders of skin substitute products from providers rather than consumers and is compensated by commission" and "is not an employee of MedTek Parties." (Doc. 53 ¶¶ 153, 155). While the allegations here straddle the line between well-pleaded facts and mere legal conclusions, they are sufficient to state a PCSRA claim at this stage.

### v. **Fraudulent Inducement**

The FAC alleges that "[t]he MedTek Parties made numerous material misrepresentations and deliberate omissions to Ryan prior to the signing of the Andelle Agreement and the Precision Agreement with the intent that Ryan and his companies would rely on these representations." (Doc. 53 ¶ 161). The MedTek Parties argue that the fraud claim should be dismissed because (1) the parol evidence rule does not permit the use of extrinsic evidence to demonstrate fraudulent inducement, (2) this claim is barred by the gist of the action doctrine, and, (3) fraud has not been pled with specificity in violation of Federal Rule of Civil Procedure 9. (Doc. 64 at 34-46).

Fraudulent inducement under Pennsylvania law requires "1) a false representation; 2) materiality; 3) scienter; 4) justifiable reliance; and 5) damage as a proximate result." Piper v. Am. Nat'l. Life Ins. Co., 228 F. Supp. 2d 553, 559 (M.D. Pa. 2002). Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Therefore, allegations of fraud must be supported "'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 812 F.3d 294, 307 (3d Cir. 2016) (quoting In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002)).

The Precision Parties have not met Rule 9(b)'s heightened pleading standard. True, the FAC alleges a series of "material misrepresentations and deliberate

omissions," (Doc. 53 ¶ 162), but these allegations lack "the who, what, when, where and how of the events at issue." In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d at 217. The failure to provide such specificity is fatal to the Precision Parties' fraudulent inducement claim, and it is therefore dismissed.

### vi.  Tortious Interference

The FAC alleges that the MedTek Parties tortiously interfered with Precision's contractual relations with its sales representatives by, among other things, "defaming the Precision Parties; lying about the termination of the Precision Agreement; [and] falsely claiming the Precision Parties committed unlawful acts" in order to, among other things, poach these representatives and diminish Precision's ability to pay these representatives and fund the instant litigation. (Doc. 53 ¶¶ 170-180).

The MedTek Parties contend that this claim should be dismissed for three reasons. First, they argue that the Precision Parties' failure to append the FAC with a copy of the contracts with sales representatives results in their failure to adequately plead such contractual relations exist. (Doc. 64 at 46-47). Second, the FAC fails to allege whether the sales representatives were employees or independent contractors; if they were the latter, and absent a non-compete agreement, the alleged communications were permissible under the Precision Agreement. (Id. at 47-48). And third, "any of the alleged contact between MedTek and its principals with Precision's sales representatives would be privileged or justified and could not constitute tortious interference." (Id. at 48-49).

To state a claim of tortious interference with contractual relations under Pennsylvania law, a party must demonstrate "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 384 (3d Cir. 2004) (quoting Crivelli v. General Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000)). With respect to privilege, a plaintiff must show "not only that a defendant acted intentionally to harm the plaintiff, but also that those actions were improper." Salsgiver Commc'ns, Inc. v. Consol. Commc'ns Holdings, Inc., 150 A.3d 957, 964 (Pa. Super. Ct. 2016) (quoting Empire Trucking Co., Inc. v. Reading Anthracite Coal Co., 71 A.3d 923, 934 (Pa. Super. Ct. 2013)).

The MedTek Parties' arguments are insufficient to warrant dismissal. First, they fail to provide any support for the claim that a failure to attach the contracts with which a party has allegedly interfered is fatal to a tortious interference claim at the motion to dismiss stage. Conversely, the FAC sufficiently alleges such contracts exist and contains, among other things, an alleged screenshot of a text message from Dietrich to a sales representative asking to see the contract between Precision and the sales representative. (Doc. 53 ¶ 82). Second, whether the sales representatives were employees of Precision or independent contractors, and the purported lack of a non-compete agreement on the permissibility of the MedTek

Parties' communications under the Precision Agreement, are questions of fact that are improper to decide on a motion to dismiss. And third, the FAC sufficiently alleges that the MedTek Parties' communications were both intentional and improper. For example, the Precision Parties contend that the MedTek Parties were "falsely claiming and wrongfully advising sales representatives that they never had an executed agreement with Precision in order to entice them to leave Precision." (Id. ¶ 174). Therefore, this claim survives a motion to dismiss.

### vii. **Defamation**

The FAC alleges that the MedTek Parties made numerous defamatory statements to sales representatives, manufacturers, and providers that Precision was engaged in compliance violations and unlawful activities. (Doc. 53 ¶¶ 106, 181-194). The MedTek Parties argue that the FAC's defamation claim must be dismissed because these alleged statements are true (a defense to defamation), expressions of opinion (which cannot be defamatory), or, at the very least, are privileged. (Doc. 64 at 49-52).

To bring a claim for defamation under Pennsylvania law, a plaintiff must prove "(1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) an understanding by the reader or listener of its defamatory meaning; (5) an understanding by the reader or listener of an intent by the defendant that the statement refers to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged position." 42 Pa. C.S. § 8343(a). A defamatory statement "tends to harm an individual's reputation so as to lower him or her in the estimation of the

community or deter third persons from associating or dealing with him or her."
Moore v. Cobb–Nettleton, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005) (citation
omitted). A mere statement of opinion, however, is not defamatory. Id.

The FAC adequately alleges a defamation claim. At this stage, it is not
possible to assess the truth of the allegedly defamatory statements; whether the
Precision Parties, in fact, have engaged in compliance violations and unlawful
activities is a quintessential factual issue. Similarly, these factual matters cannot, by
definition, be matters of opinion. And whether communications between the
MedTek Parties, Precision's sales representatives, manufacturers, and providers
are privileged is also a question of fact. Therefore, the allegations contained in the
FAC sufficiently plead a defamation claim at the motion to dismiss stage.

### viii.  Unjust Enrichment

The FAC pleads unjust enrichment in the alternative if the Precision
Agreement is invalid or unenforceable. (Doc. 53 ¶¶ 195-199). A plaintiff alleging
unjust enrichment must demonstrate "benefits conferred on defendant by plaintiff,
appreciation of such benefits by defendant, and acceptance and retention of such
benefits under such circumstances that it would be inequitable for defendant to
retain the benefit without payment of value." Gutteridge v. J3 Energy Grp., Inc., 165
A.3d 908, 917 (Pa. Super. Ct. 2017) (citation omitted). Put differently, the party
claiming unjust enrichment "must show that the party against whom recovery is
sought 'either wrongfully secured or passively received a benefit that it would be
unconscionable for her to retain.'" Torchia ex rel. Torchia v. Torchia, 499 A.2d 581,
582 (Pa. Super. Ct. 1985) (quoting Roman Mosaic & Tile Co. v. Vollrath, 313 A.2d

305, 307 (Pa. Super. Ct. 1973)). This determination turns "on the unique factual circumstances of each case." <u>Gutteridge</u>, 165 A.3d at 917 (citation omitted).

The MedTek Parties argue "[t]he Precision Parties have not alleged an improper benefit conferred on either MedTek, Dietrich and/or Matsangakis."[5] (Doc. 64 at 54). That is belied by the FAC, which alleges that the benefit is the "many millions of dollars of revenue" that the Precision Parties allegedly conferred upon the MedTek Parties, that MedTek has allegedly "failed and refused to pay Precision the amounts Precision is owed and will be owed as commissions," and that the MedTek Parties' acceptance and retention of this benefit is inequitable such that the Precision Parties should "receive the amounts [they] are owed and will be owed." (Doc. 53 ¶¶ 197-199). Whether these allegations prove to be true will be uncovered later in this case, but they are sufficient to allege an unjust enrichment claim at the pleading stage. The MedTek Parties' motion to dismiss this claim, therefore, is denied.

### ix. **Leave to Amend**

Federal Rule of Civil Procedure 15 governs the filing of amended pleadings. <u>See</u> FED. R. CIV. P. 15(a). Rule 15(a) contemplates amendment of an existing pleading and is intended "to enable a party to assert matters that were overlooked

---

[5] The MedTek Parties also argue that the unjust enrichment claim cannot stand against Dietrich and Matsangakis because they were not parties to the Precision Agreement. (Doc. 64 at 53). But this circular argument fails on its face because unjust enrichment is pled to the extent that the Precision Agreement is invalid or unenforceable. (Doc. 53 at ¶ 196). If there is no valid and enforceable contract, then it is of no moment that Dietrich and Matsangakis did not sign that contract so long as they were unjustly enriched at the Precision Parties' expense.

or were unknown" when the original pleading was filed. <u>Garrett v. Wexford Health</u>, 938 F.3d 69, 82 (3d Cir. 2019) (quoting 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1473 (3d ed. 2019)).

Under Federal Rule of Civil Procedure 15, leave to amend should be freely given "when justice so requires." FED. R. CIV. P. 15(a)(2). Circumstances that weigh against granting leave include undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility. <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). Amendment is considered futile if the pleading, "as amended, would fail to state a claim upon which relief could be granted." <u>*In re* Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1434 (3d Cir. 1997). Rule 15 aims to offer the "'maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities.'" <u>United States v. Thomas</u>, 221 F.3d 430, 435 (3d Cir. 2000) (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1471 (2d ed.1990) (2000 Supp.)).

### a. <u>Fraudulent Inducement</u>

The Precision Parties will be granted leave to amend their fraudulent inducement claim. True, the FAC currently fails to plead "the who, what, when, where and how of the events at issue." <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d at 217. But it appears that the Precision Parties will be able to amend their counterclaim to contain this information such that granting leave to amend will not be futile. <u>See *In re* Burlington Coat Factory Sec. Litig.</u>, 114 F.3d at 1434. And, notwithstanding the MedTek Parties' arguments to the contrary, the parol evidence

rule does not bar the use of extrinsic evidence to prove this fraudulent inducement claim, nor is this claim barred by the gist of the action doctrine.

Consider first the parol evidence rule, which typically "prevents the use of extrinsic evidence to nullify, modify, or augment the terms of a contract." SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 213 (3d Cir. 2022). Where the parol evidence rule applies, "the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004) (quoting Gianni v. Russell & Co., 126 A. 791, 792 (Pa. 1924)). This rule does not apply, however, in the case of fraud. Id. Extrinsic evidence may be used to support a claim for fraudulent inducement of integrated contracts[6] because such evidence is being used "to prove a precontractual misrepresentation or concealment – not to alter or vary the terms of the contract." SodexoMAGIC, 24 F.4th at 213. This is so unless the contract contains a so-called "fraud-insulating" clause which "prevent[s] a party from satisfying the justifiable-reliance element of a fraudulent inducement claim." Id. Examples of such clauses include, among other things, "a no-reliance clause, through which a party expressly disclaims reliance on another party's precontractual representations." Id. at 214. Where the contract contains a fraud-

---

[6] See Restatement (Second) Contracts § 209(1) ("An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.").

insulating clause, the parol evidence rule "precludes fraudulent inducement claims that depend on a precontractual misrepresentation." Id.

Here, the parol evidence rule's fraud exception applies because the Precision Parties seek to "to prove a precontractual misrepresentation or concealment – not to alter or vary the terms of the contract." SodexoMAGIC, 24 F.4th at 213. The sum of the Precision Parties' allegations is that the MedTek Parties made a series of material misrepresentations and omissions that induced them into entering an agreement they otherwise would not have. (Doc. 53 ¶¶ 161-162, 164). Nor does the Precision Agreement contain a fraud-insulating clause. SodexoMAGIC, 24 F.4th at 214. Therefore, extrinsic evidence may be used to prove the Precision Parties' fraudulent inducement claim.

Nor would the gist of the action doctrine bar the Precision Parties' fraudulent inducement claim. "Arising out of the concern that tort recovery should not be permitted for contractual breaches[,]" Addie v. Kjaer, 737 F.3d 854, 865 (3d Cir. 2013), "the [gist of the action] doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims." eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002). This policy-based doctrine addresses "the concern that tort recovery should not be permitted for contractual breaches" by "preclud[ing] tort suits for the mere breach of contractual duties unless the plaintiff can point to separate or independent events giving rise to the tort." Addie, 737 F.3d at 865-866 (internal citations omitted). This analysis turns on the nature of the allegations contained the plaintiff's complaint. Bruno v. Erie Ins. Co., 106 A.3d 48, 68 (Pa. 2014). If these allegations indicate a

breach of a duty "created by the parties by the terms of the contract," then the claim exists as a breach of that contract. Id. But if these allegations indicate a breach "of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract," then the underlying claim "must be regarded as a tort." Id. The "mere existence of a contract between two parties does not, *ipso facto*, classify a claim . . . as one for breach of contract." Id. at 69.

The gist of the action doctrine does not apply to the Precision Parties' fraudulent inducement claim. This claim does not seek judicial remedy for breach of the Precision Agreement—the FAC alleges a separate breach of contract claim—but rather seeks recourse for the harms they have allegedly suffered as a result of the MedTek Parties' material misrepresentations and omissions absent which they would not have contracted with the MedTek Parties. (Doc. 53 ¶¶ 161-162, 164, 166). This is a quintessential tort claim which exists outside of the contract between the parties. Bruno, 106 A.3d at 68.

Further, the MedTek Parties have failed to demonstrate that the Precision Parties' inadequate fraud allegations were caused by "undue delay, bad faith or dilatory motive," nor would the MedTek Parties be unduly prejudiced by granting such leave to amend. See Foman, 371 U.S. at 182. Permitting the Precision Parties to amend their fraud claim will further the purpose of Rule 15 to allow for disposition of this issue on the merits. See Thomas, 221 F.3d at 435.

### b.  <u>Veil-Piercing</u>

Similarly, the Precision Parties will be granted leave to amend their veil-piercing theory. The Precision Parties have not, though plausibly could, meet their "notoriously difficult" burden of alleging that MedTek operates as "little more than a legal fiction" concocted by Reserve Real Estate, Dietrich, and Matsangakis at the time of the Precision Contract. <u>Pearson</u>, 247 F.3d at 485.

### c.  <u>Motion To Strike</u>

The MedTek Parties move to strike paragraphs 1, 2, 5, 7, 8, 10, 27, 28, 29, 30, 31, 41, 62, 63, 64, 77, 110-115, and 123-128 of the FAC as well as the FAC's request for punitive damages and references to allegedly "malicious, willful, wanton, and reckless" conduct. (Doc. 63 at ECF 3-4; Doc. 64 at 55-58).

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Doing so, however, is a "drastic remedy" which courts generally disfavor. <u>Homesite Ins. Co. of Midwest v. Geaith</u>, No. 1:22-CV-1664, 2023 WL 362387, at *1 (M.D. Pa. Jan. 30, 2023); <u>see also</u> <u>Fiorentino v. Cabot Oil & Gas Corp.</u>, 750 F. Supp. 2d 506, 509 (M.D. Pa. 2010) ("Relief under Federal Rule of Civil Procedure 12(f) is generally disfavored, and will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case."). The moving party bears the burden of demonstrating "that the challenged matter should be stricken." <u>Roamingwood Sewer & Water Ass'n v. Nat'l Diversified Sales, Inc.</u>, 509 F. Supp. 3d 198, 204 (M.D. Pa. 2020). Immaterial matter under Rule 12(f) "is that which has no

essential or important relationship to any claims for relief." <u>Wagner v. Holtzapple</u>, <u>101 F. Supp. 3d 462, 488 (M.D. Pa. 2015)</u>. A pleading contains impertinent matters if those matters "consist[] of statements that do not pertain, and are not necessary, to the issues in question." <u>Id</u>. And scandalous matter "casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court." <u>Id</u>.

These standards make clear that the motion to strike is improper. The MedTek Parties did not cite any caselaw to support their assertion that the paragraphs enumerated above should be stricken. (Doc. 64 at 56-57.)  Rather, they merely recite that these paragraphs contain immaterial, impertinent, and scandalous matters. (<u>See</u> <u>id</u>.) This is not enough to carry the burden of demonstrating that Rule 12(f)'s "generally disfavored" and "drastic remedy" is warranted for these paragraphs. <u>See</u> <u>Roamingwood Sewer & Water Ass'n</u>, 509 F. Supp. 3d at 204; <u>Fiorentino</u>, 750 F. Supp. 2d at 509; <u>Homesite Ins. Co.</u>, 2023 WL 362387, at *1.

The MedTek Parties' motion to strike the FAC's request for punitive damages and references to allegedly "malicious, willful, wanton, and reckless" conduct also fails. They argue that these claims sound in contract, not tort, and thus punitive damages are inapplicable. (Doc. 64 at 58). That is wrong. Fraudulent inducement, tortious interference, and defamation are all tort claims for which punitive damages may be awarded under Pennsylvania law. <u>See</u> <u>Williamsburg Commons Condo. Ass'n v. State Farm Fire & Cas. Co.</u>, 907 F. Supp. 2d 673, 679 (E.D. Pa. 2012) (observing that "punitive damages are available for tort claims"). With respect to their request to strike the FAC's references to allegedly "malicious,

willful, wanton, and reckless" conduct, the Medtek Parties have not demonstrated that these references are immaterial, impertinent, or scandalous, and therefore this request to strike is denied as well.

### d.  **Motion To Stay Discovery**

The MedTek Parties have moved to stay discovery pending the disposition of their motion to dismiss the FAC. (Doc. 65). Because this memorandum and the corresponding order of today's date resolves the motion to dismiss, the MedTek Parties' motion to stay discovery is denied as moot.

IV.    **Conclusion**

For the reasons stated above, the court will grant in part and deny in part

the motion to dismiss, will deny the motion to strike, and will deny the motion to

stay discovery as moot. The Precision Parties will be granted leave to amend. An

appropriate order will follow.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:    June 30, 2025